IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

| | | |
|---|---|---|
| REDINA HAYSLETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 1:22-cv-1123-STA-jay |
| | ) | |
| TYSON FOODS, INC. and its wholly | ) | |
| owned subsidiary, THE HILLSHIRE | ) | |
| BRANDS COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER DENYING DEFENDANTS' MOTION TO DISMISS IN PART

Before the Court is Defendants Tyson Foods, Inc. and The Hillshire Brands Company's Motion to Dismiss in Part (ECF No. 30) filed February 17, 2023.  Defendants seek the dismissal of Plaintiff Redina Hayslett's claims under Tenn. Code Ann. § 14–2–102(a), Tennessee's statutory protection for individuals who harbor an objection to taking a COVID-19 vaccine. Plaintiff has responded in opposition, and Defendants have filed a reply.  The Attorney General and Reporter of the State of Tennessee has filed a brief in defense of the Tennessee law, in response to which Defendants have also filed a brief.  For the reasons set forth below, the Motion to Dismiss in Part is **DENIED**.

## BACKGROUND

Plaintiff filed her Complaint (ECF No. 9) on June 9, 2022. For purposes of deciding Defendants' Rule 12(b)(6) Motion, the Court accepts as true the following well-pleaded facts from the Complaint. Plaintiff had worked on a production line in Defendants' Newbern, Tennessee pork processing plant since 1996.  Compl. ¶ 7.  Other than taking a few days off as

she recovered from surgery in 2019, Plaintiff had a perfect attendance record over nearly 26 years of service. *Id.* ¶ 9. On August 3, 2021, Defendants announced to all employees that as a condition of continued employment and in the absence of documented and approved reasonable accommodations for disability or sincerely held religious beliefs, practices, or observances, all U.S.-based Tyson employees would be required to be vaccinated against COVID-19 and to provide proof of vaccination. *Id.* ¶ 10. Employees, including Plaintiff, had to submit proof of vaccination no later than November 1, 2021. *Id.* ¶ 11.

When Plaintiff requested a religious accommodation, Defendants offered her up to one year of absence without pay that would commence November 1, 2021. *Id.* ¶ 15. Defendants explained to Plaintiff that her other options were taking the vaccine or termination. *Id.* ¶ 16. After Defendants refused Plaintiff's request for an alternative accommodation, *id.* ¶ 17, Plaintiff elected to take the unpaid leave of absence, effective November 1, 2021. *Id.* ¶ 18. In May 2022, Plaintiff notified Defendants she no longer wanted to remain on unpaid leave and requested a return to work. *Id.* ¶ 20. Defendants refused her request to come back without first receiving the vaccine. *Id.* ¶ 21. Based on these factual premises, the Complaint alleges that Defendants have terminated or constructively terminated Plaintiff's employment in violation of Tenn. Code Ann. § 14–2–102(a).

On October 22, 2022, the Court denied Defendants' motion to dismiss the initial Complaint, holding that Plaintiff had stated a plausible claim under Tenn. Code Ann. § 14–2–102(a). The Court concluded Defendants had taken "adverse action" against Plaintiff after the law had taken effect because Plaintiff alleged Defendants had terminated her employment in May 2022. In seeking the dismissal of the claim, Defendants had argued that Plaintiff could not obtain relief based on her unpaid leave, which began November 1, 2021, eleven days before Title

14 became the law in Tennessee.  The Complaint, however, alleged that Defendants had terminated Plaintiff after the law's effective date.  The Court went on to hold in the alternative that even if the Complaint could be read to allege unpaid leave as the only adverse action Plaintiff had suffered, that would suffice to state a claim pursuant to Tenn. Code Ann. § 14–2–102(a).  Defendants' unpaid leave policy may have begun before the law's effective date.  However, the unpaid leave was an ongoing adverse action and continued beyond the effective date of the law.  Therefore, the original Complaint stated a plausible Title 14 claim.

On October 24, 2022, Plaintiff filed an Amended Complaint (ECF No. 24), adding an allegation that Defendants had violated Title VII of the Civil Rights Act of 1964 by discriminating against Plaintiff on the basis of her religion.

In their Motion to Dismiss in Part, Defendants argue that federal law preempts Tennessee's COVID law and therefore the statute is unconstitutional.  Defendants cite an April 28, 2020 Executive Order issued by the President of the United States as well as guidance from the Centers for Disease Control ("CDC") and the Occupational Safety and Health Administration ("OSHA").  In Defendants' view, the Executive Order bound meat and poultry processors like Defendants to take all steps to continue their operations during the COVID-19 pandemic.  The President acted in response to orders issued in some states that meat and poultry processors suspend operations to curb outbreaks of COVID-19 among employees at processing plants.  The Executive Order and the CDC and OSHA guidance on which the Executive Order were based preempt Tennessee's attempt to set a different policy on COVID-19 and its impact on Defendants' meat processing operations in the State of Tennessee.

Defendants further argue that the Federal Meat Inspection Act ("FMIA") preempts Tennessee's Title 14.  The FMIA contains an express preemption provision, stating that the Act

precludes state lawmaking on any matter "within the scope" of the FMIA. Defendants argue that the test is whether the federal government could have adopted "the requirement at issue," presumably a reference to mandatory worker vaccination. In support of their position, Defendants point to the FMIA's implementing regulations addressed to employee hygiene and infectious disease. Defendants contend that because the USDA has adopted regulations to control "infectious disease," Tennessee's regulation on proof of vaccination falls "within the scope" of the FMIA. Therefore, the Court should hold that the FMIA expressly preempts Tenn. Code Ann. § 14–2–102(a).

Upon filing its Motion to Dismiss in Part, Defendants served notice on the Attorney General of the State of Tennessee, showing that Defendants challenged the constitutionality of the Tennessee statute. On March 22, 2023, the Court granted (ECF No. 38) the State of Tennessee's motion to intervene. The State has now responded in opposition (ECF No. 40) to Defendant's Motion to Dismiss in Part. According to the State, Defendants have not shown how the Executive Order preempts Title 14's anti-discrimination provision. Title 14 does not directly conflict with the Executive Order. Defendants have not shown that they cannot comply with both the Executive Order and Title 14 or that Title 14 is an obstacle to the Executive Order. To the extent that Defendants have argued that the Executive Order intended to occupy the entire field of meat processing operations, the Executive Order cuts against Defendants' argument. The Executive Order delegated authority to the Secretary of Agriculture. However, the Executive Order specifically excluded a delegation of authority to compel performance of "contracts of employment." The State contends that this facet of the Executive Order does not suggest an intent to occupy a field to the exclusion of state regulation.

The State of Tennessee goes on to argue that the FMIA does not preempt Title 14. The FMIA "protects consumers from adulterated meat products" and not "workers from infectious disease." State's Br. 8 (ECF No. 40). The "infectious disease" regulations cited by Defendants have as their purpose the safe handling and processing of meat, not the protection of meat processing workers. Defendants have not shown that their vaccine mandate was necessary to prevent the adulteration of meat. The State lastly points out that Defendants have since lifted their vaccine mandate.

## STANDARD OF REVIEW

A defendant may move to dismiss a claim "for failure to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6). Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion, the Court must treat all of the well–pleaded allegations of the pleadings as true and construe all of the allegations in the light most favorable to the non–moving party. *Elec. Merchant Sys. LLC v. Gaal*, 58 F.4th 877, 882 (6th Cir. 2023) (citing *Taylor v. City of Saginaw*, 922 F.3d 328, 331 (6th Cir. 2019)). However, legal conclusions or unwarranted factual inferences need not be accepted as true. *Fisher v. Perron*, 30 F.4th 289, 294 (6th Cir. 2022) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).

Defendants argue that federal law preempts Plaintiff's claim under Tennessee law. The Supremacy Clause of the U.S. Constitution states that "the Laws of the United States . . . shall be the supreme Law of the Land . . . , any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "The phrase 'Laws of the United States' encompasses both federal statutes themselves and federal regulations that are properly adopted in accordance with statutory authorization." *In re Ford Motor Co. F-150 & Ranger Truck Fuel*

*Econ. Mktg. & Sales Practices Litig.*, 65 F.4th 851, 859 (6th Cir. 2023) (quoting *City of New York v. F.C.C.*, 486 U.S. 57, 63, 108 S.Ct. 1637, 100 L.Ed.2d 48 (1988)).  This simply means "state laws that 'interfere with, or are contrary to the laws of congress, made in pursuance of the constitution' are invalid." *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 604, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991) (quoting *Gibbons v. Ogden*, 22 U.S. 1, 9 Wheat. 1, 211, 6 L.Ed. 23 (1824)).

The Supreme Court has adopted what it has described as "two cornerstones" of its "pre-emption jurisprudence." *Wyeth v. Levine*, 555 U.S. 555, 565, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009).  First, "the purpose of Congress is the ultimate touchstone in every pre-emption case." *Id.* (quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)).  Also, "[i]n all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' . . . we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Id.*  So the "inquiry is largely one of federal purpose, that is, whether a statute or regulation evinces an 'intent to supplant state authority in a particular field.'" *Mortier*, 501 U.S. at 604–05, 111 S.Ct. 2476.

Preemption is an affirmative defense. *Hudak v. Elmcroft of Sagamore Hills*, 58 F.4th 845, 852 (6th Cir. 2023).  As a result, a defendant asserting preemption has "the burden of proof in establishing preemption as grounds for dismissal." *In re Ford Motor*, 65 F.4th at 859 (citing *Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 912 (6th Cir. 2007)).  This means Defendants as the parties seeking dismissal here must show "that federal preemption potentially applies to the facts and circumstances of the suit." *Brown*, 481 F.3d at 913 (setting out the burden of proof when a party seeks summary judgment on its preemption defense).

## ANALYSIS

The issue presented in this case is whether Executive Order 13917 and the Federal Meat Inspection Act preempt Plaintiff's claim under Tenn. Code Ann. § 14–2–102(a). Preemption comes in more than one variety. "State-law claims can be preempted expressly in a federal statute or regulation, or impliedly, where congressional intent to preempt state law is inferred." *In re Ford Motor*, 65 F.4th at 859 (citing *McDaniel*, 893 F.3d at 944). Statutes containing an express preemption clause may make clear an intent that federal law "is displacing or prohibiting the enactment of state legislation in a particular area." *Matthews v. Centrus Energy Corp.*, 15 F.4th 714, 720 (6th Cir. 2021).

When the federal government does not act with the express intent of preempting state law, preemption may nevertheless result by implication. So-called implied preemption takes two forms, field preemption and conflict preemption. "Field preemption occurs 'where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Id*. (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992)). Conflict preemption arises when federal law "has not entirely displaced state regulation over the matter in question." *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). The federal law may still preempt state law "to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Id*. (internal citations omitted). The Sixth Circuit has remarked that field preemption and conflict preemption, while "separate categories," are not "rigidly distinct." *Matthews*, 15 F.4th at 720 (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 n.5, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990)).

In the final analysis, all forms of preemption "work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Murphy v. Nat'l Coll. Athletic Ass'n*, 138 S.Ct. 1461, 1480, 200 S.Ct. 854 (2018).

Defendants argue that Executive Order 13917 issued by the President on April 28, 2020, and a series of recommendations from the CDC and OSHA all preempt the Tennessee statute. Defendants also argue that the FMIA and implementing regulations of the FMIA found at 9 C.F.R. §§ 416.2(b) and 416.5(b) & (c) preempt Tenn. Code Ann. § 14–2–102(a).   Before reaching the merits of Defendants' arguments, the Court will examine the Tennessee statute and then proceed to decide whether any source of federal law preempts it.

## I.     Tennessee Title 14 Tenn. Code Ann. § 14–1–101 *et seq*.

The Tennessee General Assembly enacted Title 14 of the Tennessee Code Annotated, effective November 12, 2021, to create a number of protections related to the COVID-19 pandemic.   Tenn. Code Ann. § 14–1–103 ("The purpose of this title is to safeguard the constitutional rights and liberty interests of persons during the COVID-19 pandemic.").   Plaintiff alleges her claim under Tenn. Code Ann. § 14–2–102(a), the Title 14 provision addressed to COVID-19 vaccination status.   That section prohibits a "private business, governmental entity, school, or local education agency" from "compel[ling] or otherwise tak[ing] an adverse action against a person to compel the person to provide proof of vaccination if the person objects to receiving a COVID-19 vaccine for any reason."   § 14–2–102(a).   Tenn. Code Ann. § 14–2–102(a) requires a person injured under the section to prove the following elements: (1) that a "private business" or other covered entity (2) compelled the person to provide "proof of

vaccination" or, in the alternative, took an "adverse action" against the person to compel the person to provide "proof of vaccination" (3) over the person's objection to receiving a COVID-19 vaccine for any reason. *Sadler v. Tyson Foods, Inc.*, No. 1:22-cv-2203, 2022 WL 1721058, at *4 (W.D. Tenn. May 27, 2022); *see also* Edward G. Phillips & Brandon L. Morrow, *Not-So-Conscientious Objections: Tennessee's New Law to Combat Vaccine Mandates*, 58 Tenn. Bar J. 44, 45 (Feb. 2022) ("Speaking of objections, on what grounds can employees object to the vaccine? The answer: on any ground they want."). Title 14 grants a person injured as a result of such a violation a private right of action to seek "injunctive relief and to recover compensatory damages and reasonable attorneys' fees against an alleged violator." § 14–6–103.

In its order denying Defendants' motion to dismiss the original Complaint, the Court held that Plaintiff had stated a plausible claim for the violation of Tenn. Code Ann. § 14–2–102(a). Having first addressed the merits of the pleadings, the Court now takes up Defendants' preemption defense and their constitutional argument that federal law preempts Tenn. Code Ann. § 14–2–102(a). *Torres v. Precision Indus., Inc.*, 938 F.3d 752, 755 (6th Cir. 2019) (holding that "courts should not address a question of preemption if they can resolve the case on other grounds").

## II.     Presidential Executive Order 13917

Defendants first argue that Executive Order 13917 preempts Plaintiff's claim for the violation of Tenn. Code Ann. § 14–2–102(a).  On April 28, 2020, the President issued Executive Order 13917, directing the Secretary of Agriculture to "take all appropriate action under [the Defense Production Act of 1950] to ensure that meat and poultry processors continue operations consistent with the guidance for their operations jointly issued by the CDC and OSHA." Executive Order on Delegating Authority Under the DPA With Respect to Food Supply Chain

Resources During the National Emergency Caused by the Outbreak of Covid-19, Apr. 28, 2020,

85 F.R. 26313, 2020 WL 2060381, at *1 (hereinafter "Executive Order 13917" or "Executive

Order").

     The President issued Executive Order 13917 pursuant to powers Congress granted the

President under the Defense Production Act of 1950 ("DPA").  The DPA, 50 U.S.C. § 4511,

authorizes "the President to direct private companies to prioritize federal contracts in exigent

circumstances." *Buljic v. Tyson Foods, Inc.*, 22 F.4th 730, 736 n.3 (8th Cir. 2021).  Section

4511(a) grants the President the power

> (1) to require that performance under contracts or orders (other than contracts of
> employment) which he deems necessary or appropriate to promote the national
> defense shall take priority over performance under any other contract or order,
> and, for the purpose of assuring such priority, to require acceptance and
> performance of such contracts or orders in preference to other contracts or orders
> by any person he finds to be capable of their performance, and (2) to allocate
> materials, services, and facilities in such manner, upon such conditions, and to
> such extent as he shall deem necessary or appropriate to promote the national
> defense.

50 U.S.C. § 4511(a).  Section 4511(b) then conditions the President's authority to "control the

general distribution of any material in the civilian market" under § 4511(a) upon a finding that

"(1) that such material is a scarce and critical material essential to the national defense, and (2)

that the requirements of the national defense for such material cannot otherwise be met without

creating a significant dislocation of the normal distribution of such material in the civilian market

to such a degree as to create appreciable hardship."  § 4511(b).

     Section 1 of the Executive Order set out the findings required under § 4511(b).  The

President adopted a policy statement regarding the importance of "processors of beef, pork, and

poultry ('meat and poultry') in the food supply chain" and their role in providing "a continued

supply of protein" for the country.  Executive Order, 2020 WL 2060381, at *1.  The Executive

Order noted "outbreaks of COVID-19 among workers at some processing facilities," which had resulted in "the reduction in some of those facilities' production capacity." *Id*. The Executive Order also noted "recent actions in some States," by which state governments had required "the complete closure of some large processing facilities." *Id*. The Executive Order found that these state-ordered closures had "differ[ed] from or be[en] inconsistent with interim guidance recently issued by the Centers for Disease Control and Prevention (CDC) of the Department of Health and Human Services and the Occupational Safety and Health Administration (OSHA) of the Department of Labor entitled 'Meat and Poultry Processing Workers and Employers' providing for the safe operation of such facilities." *Id*. The President found that "[s]uch closures threaten[ed] the continued functioning of the national meat and poultry supply chain, undermining critical infrastructure during the national emergency." *Id*. Based on these policy considerations, the Executive Order found that meat and poultry met "the criteria specified in [§ 4511(b)]." *Id*.

Having made the determination required by § 4511(b), the President invoked the authority granted under § 4511(a) "to require performance of contracts or orders (other than contracts of employment) to promote the national defense over performance of any other contracts or orders, to allocate materials, services, and facilities as deemed necessary or appropriate to promote the national defense, and to implement" other provisions of the DPA "with respect to food supply chain resources, including meat and poultry, during the national emergency caused by the outbreak of COVID-19 within the United States." Executive Order, 2020 WL 2060381, at *2. The President then delegated his DPA authority to the Secretary of Agriculture and directed the Secretary to "use the authority [under § 4511(a) of the DPA] . . . to determine the proper nationwide priorities and allocation of all the materials, services, and

facilities necessary to ensure the continued supply of meat and poultry, consistent with the guidance for the operations of meat and poultry processing facilities jointly issued by the CDC and OSHA" and "issue such orders and adopt and revise appropriate rules and regulations as may be necessary to implement this order." *Id*. The President made the delegation pursuant to 3 U.S.C. § 301, where Congress granted the President authority to delegate "any function which is vested in the President by law" to "the head of any department or agency in the executive branch, or any official thereof who is required to be appointed by and with the advice and consent of the Senate." 3 U.S.C. § 301.

The question is whether the Executive Order preempts by implication Tenn. Code Ann. § 14–2–102(a). Tenn. Code Ann. § 14–2–102(a) prohibits a "private business" from "compel[ling] or otherwise tak[ing] an adverse action against a person to compel the person to provide proof of vaccination if the person objects to receiving a COVID-19 vaccine for any reason." Tenn. Code Ann. § 14–2–102(a). The Court has construed this paragraph to have as one of its required elements proof that a person holds an objection to receiving a COVID-19 vaccine for any reason. *Sadler*, 2022 WL 1721058, at *3. This construction is consistent with the Tennessee General Assembly's finding that "every person within this state is and must remain free to choose or to decline to be vaccinated against COVID-19 without penalty or threat of penalty." § 14–1–102(6). For the following reasons, the Court holds that Defendants have not overcome the presumption against preemption and shown that Executive Order 13917 preempts Tenn. Code Ann. § 14–2–102(a).

First, Defendants have not argued that the Executive Order expressly preempts Tenn. Code Ann. § 14–2–102(a). The Executive Order contains no express preemption clause and does not directly countermand or override any state law or regulation to the contrary. Even though the

President apparently acted in response to state-ordered closures of meat and poultry facilities, the Executive Order did not expressly reverse a state-ordered closure of any particular meat or poultry facility.  In fact, the only directive in the Executive Order is addressed to the Secretary of Agriculture.  The Executive Order is primarily an invocation of the President's DPA authority and a delegation of that authority to the Secretary.  Other than the President's instructions to USDA, the Executive Order contains no other express directives at all.  There is no reason to find that Executive Order 13917 expressly preempted Tennessee law.

In order to avail themselves of the preemption defense then, Defendants must show that the Executive Order preempted Tenn. Code Ann. § 14–2–102(a) by implication.  Defendants argue that the Court can infer preemption in this case under the doctrine of field preemption. Field preemption arises by implication when "federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.'"  *Murphy*, 138 S.Ct. at 1480 (quoting *R.J. Reynolds Tobacco Co. v. Durham Cnty.*, 479 U.S. 130, 140, 107 S.Ct. 499, 93 L.Ed.2d 449 (1986)).  For example, the Supreme Court has held that federal law preempts parallel state laws under the doctrine of field preemption in the area of alien registration.  *Arizona v. United States*, 567 U.S. 387, 401, 132 S.Ct. 2492, 2502 (2012) ("[T]he Federal Government has occupied the field of alien registration.").  According to Defendants, Executive Order 13917 occupied the field of "the entirety of meat and poultry processing plant operations." Defs.' Reply 4 (ECF No. 44).

The Court holds, however, that Defendants have not carried their burden to support such a capacious reading of the Executive Order, at least at the pleadings stage.  Defendants have not actually shown that Executive Order 13917 was intended to occupy a field as broad as "the entirety of meat and poultry processing plant operations."  The Executive Order found for

purposes of the DPA that meat and poultry were "scarce and critical material essential to the national defense," delegated the President's authority "to require performance of contracts" and "to allocate materials, services, and facilities" for purposes of national defense to the Secretary of Agriculture, and directed the Secretary to "take all appropriate action under [the DPA] *to ensure that meat and poultry processors continue operations* consistent with the guidance *for their operations jointly issued by* the CDC and OSHA." Executive Order, 2020 WL 2060381, at *1 (citing 50 U.S.C. § 4511(b) (emphasis added)).

If Executive Order 13917 occupied a field and thus implicitly preempted any state law or directive, it addressed which sovereign had the authority to order meat processors like Defendants to suspend operations due to the outbreak of the pandemic: the federal government or the states where Defendants' meat processing plants were located.  Even at that, the Executive Order merely delegated the President's DPA powers to USDA and directed the Secretary to exercise that authority so "*that meat and poultry processors continue operations* consistent with the guidance *for their operations jointly issued by* the CDC and OSHA."  After all, the Executive Order came after some states had ordered meat processors like Defendants to suspend their operations.  In other words, the Executive Order addressed, and only indirectly and by implication, whether meat and poultry processors should follow federal or state directives to operate or shut down.  This does not suggest a sweeping intent to occupy a field as broad as "the entirety of meat and poultry processing plant operations."

What is more, the Executive Order did not direct meat and poultry processors like Defendants to take any particular action.  The President just ordered USDA to use authority under the DPA to make sure the meat and poultry industry continued to operate, even if a state government had ordered them to limit or curtail their operations.  Assuming the Secretary had

issued such an order to a meat processor like Defendants and a state had issued a contradictory order to shut down, the Executive Order would have made it impossible for meat and poultry producers to comply with both orders.  The Executive Order arguably preempted state orders by implication because of this possibility of a direct conflict between state directives and any subsequent order issued by USDA, not because the Executive Order occupied the field of "the entirety of meat and poultry processing plant operations."

The Executive Order also addressed by implication a secondary, though perhaps no less important, question of whether state officials could decide the public health or occupational safety rules for the operation of meat and poultry processing plants and, relatedly, whether states could enforce their rules to regulate or even suspend the operation of meat and poultry processing plants.  The Executive Order instructed the USDA to issue orders for meat and poultry processing plants to ensure continued operations in accordance with CDC and OSHA guidance "jointly issued" by the federal agencies specifically for the operation of meat and poultry processing plants.

But that is clearly not the same thing as directing "the entirety of meat and poultry processing plant operations."  The Executive Order did not spell out how meat processors were to operate in the midst of a global pandemic.  The Executive Order did not cite or incorporate any specific public health or occupational safety guidance.  The Executive Order certainly did not reach the question of mandatory vaccination for meat and poultry workers, which comes as no surprise.  The President issued the Executive Order months before COVID-19 vaccinations had received emergency use authorization for the public, and more than a year before Tennessee enacted Title 14.  So nothing in the Executive Order addressed the vaccination of employees working in a meat or poultry processing facility or required them to provide proof of vaccination.

Furthermore, the Executive Order directed USDA to take certain actions, not meat and poultry processors like Defendants.   Defendants have not shown whether the Secretary of Agriculture issued any such orders to direct Defendants' operations or whether the Secretary ever exercised the delegated DPA authority at all.   Defendants have only cited a May 2020 press release from the Secretary. The release largely reiterates what is already contained in the Executive Order, stressing "the [USDA's] clear expectations for the implementation of [the Executive Order,]" and the Executive Order's directive for "plants to follow the [CDC and OSHA] guidance specific to the meat processing industry to keep these critical facilities open while maintaining worker safety." USDA Release No. 0243.20.   Assuming the press release had the force of law and any preemptive effect at all, it merely echoed the points already contained in the Executive Order.   Otherwise, there is nothing before the Court to indicate whether the Secretary issued any such orders pursuant to the powers delegated to him in Executive Order 13917.  *See Glenn v. Tyson Foods, Inc.*, 40 F.4th 230, 234 (5th Cir. 2022) ("The USDA did not issue a DPA order to Tyson or any other meatpacking company.").

To the extent the Executive Order addressed meat and poultry operations at all, the Executive Order did not suggest an intent to occupy the field of "the entirety of meat and poultry processing plant operations." The Executive Order instructed USDA to issue orders for the industry in accordance with "*guidance for [meat and poultry processing] operations jointly issued by* the CDC and OSHA."  The President's determination that meat and poultry processing plants should act in conformity with *joint* CDC and OSHA *guidance* issued for the meat and poultry industry further limited the scope of the federal directive, that is, the field the Executive Order occupied.

16

For example, the Executive Order mentions agency guidance, not regulatory action. Both the CDC and OSHA have statutory authority to promulgate regulations for very different spheres of daily life. The CDC is concerned with public health. 42 U.S.C. § 264(a) (section of the Public Health Act of 1944 authorizing "the Surgeon General, with the approval of the Secretary [of Health and Human Services] to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases . . . ."); *see also* 42 C.F.R. § 70.2 (delegating this authority to the CDC). And OSHA exists to ensure "*occupational* safety—that is, "safe and healthful working conditions" by enforcing occupational safety and health standards adopted for that purpose. *Nat'l Federation of Indep. Business v. Dept. of Labor, O.S.H.A.*, 142 S.Ct. 661, 663, (2022) (quoting 29 U.S.C. § 651(b) (emphasis in original)).[1] The Executive Order never referenced regulations adopted by either agency, only guidance.

And the guidance identified in the Executive Order was not general pandemic suggestions for public health (CDC) or safer workplaces (OSGA) but guidance jointly issued by the CDC and OSHA and only joint guidance addressed specifically to meat and poultry processing plants. Rather than showing an intent to occupy "the entire field of meat and poultry operations," the Executive Order settled a more discrete question and directed the meat and poultry industry to follow federal guidance on public health and workplace safety where the

---

[1] The authority of both agencies, even during a declared state of emergency, is not without limits. *Ala. Assoc. of Realtors v. Dept. of Health & Human Servs.*, 141 S.Ct. 2485, 2487, 210 L.Ed.2d 856 (2021) (holding that CDC did not have power to impose nationwide moratorium on the eviction of renters during pandemic); *Nat'l Federation of Indep. Business*, 142 S.Ct. at 665 (holding that challengers were likely to prevail on the merits of their claim that the Occupational Health and Safety Act did not authorize OSHA to issue a nationwide vaccine mandate covering employers with more than 100 employees and preempting any state law to the contrary, because the statute "empowers the Secretary [of Labor] to set *workplace* safety standards, not broad public health measures").

agencies acted in concert to adopt measures specific to the industry and pandemic conditions. The qualified nature of the guidance described in the Executive Order does not show that the President intended to occupy the field of "the entirety of meat and poultry processing plant operations."

Defendants have cited only one instance of the CDC and OSHA issuing the kind of joint guidance mentioned in the Executive Order, and it was silent on the topic of worker vaccinations. In interim guidance issued July 9, 2020, the CDC advised that "critical infrastructure workers" like "meat and poultry processing workers" could be allowed to continue to work "following potential exposure to COVID-19, provided they remain asymptomatic, have not had a positive test result for COVID-19, and additional precautions are implemented to protect them and the community." CDC, Meat and Poultry Processing Workers and Employers: Interim Guidance from CDC and the Occupational Safety and Health Administration (OSHA) (July 9, 2020), https://stacks.cdc.gov/view/cdc/90395. The July 2020 guidance provided a number of recommendations to prevent the spread of the virus in meat and poultry processing facilities. Of course, no vaccine was available as of that date, so mandating worker vaccinations was not one of the CDC/OSHA recommendations. It follows that no preemption of a Tennessee law adopted in 2021 protecting persons on the basis of opposition to vaccines or vaccination status occurred as a result of the July 9, 2020 CDC/OSHA guidance for "critical infrastructure workers."

Defendants have not cited any other guidance jointly issued by the CDC and OSHA addressed to operations in meat and poultry processing plants. When vaccines were made available to the public at large in early 2021, the OSHA guidance cited by Defendants did not mandate vaccination for meat and poultry workers. In guidance originally issued January 29,

18

2021, and updated June 10, 2021, OSHA cautioned that the virus spread "mainly among unvaccinated people who are in close contact with one another—particularly indoors and especially in poorly ventilated spaces." OSHA described vaccination as "the key element in a multi-layered approach to protect workers" and remarked on the effectiveness of vaccines authorized by the U.S. Food and Drug Administration. OSHA, Protecting Workers: Guidance on Mitigating and Preventing the Spread of COVID-19 in the Workplace (Jan. 29, 2021), https://www.osha.gov/coronavirus/safework#what-workers-need-to-know.

Despite these findings, the OSHA guidance did not mandate vaccination or preempt any other legal protections or exemptions from vaccination. On the contrary, the guidance recognized that some employers were developing "COVID-19 prevention programs that include[d] a number of important steps to keep unvaccinated and otherwise at-risk workers safe" like the adoption of "administrative policies (e.g. vaccination policies)." But OSHA "suggest[ed] that employers consider adopting policies that require[d] workers to get vaccinated or to undergo regular COVID-19 testing–in addition to mask wearing and physical distancing–if they remain[ed] unvaccinated." *Id*. Rather than a mandate, this guidance was presented only as a "suggestion" and provided alternatives to mandatory vaccination. For purposes of the Court's preemption analysis, the OSHA guidance from 2021 was not directly applied to meat and poultry processing plants or issued jointly with the CDC. Defendants have not shown then how the OSHA guidance preempted Tenn. Code Ann. § 14–2–102(a).

In short, Defendants have not overcome the presumption against preemption. On the question of federal purpose, Defendants have not shown that the President intended to exercise his statutory authority under the DPA to occupy "the entirety of the field of meat and poultry processing plant operations," including a vaccine mandate for workers in the meat and poultry

industry.  *Mortier*, 501 U.S. at 604–05, 111 S.Ct. 2476 (remarking that the "inquiry is largely one of federal purpose, that is, whether a statute or regulation evinces an 'intent to supplant state authority in a particular field'").  Defendants have not shown then how Executive Order 13917 preempts Tenn. Code Ann. § 14–2–102(a).  Therefore, Defendants' Motion to Dismiss is **DENIED** as to this issue.

### III.    Federal Meat Inspection Act and its Regulations

Defendants raise a separate argument that the FMIA and some of its regulations preempt Tenn. Code Ann. § 14–2–102(a), either expressly or by implication.  Section 608 of the FMIA directs the Secretary of Agriculture to monitor meat processors through inspections to ensure "sanitary conditions" in meat processing facilities.  21 U.S.C. § 608.  Section 608 also requires the Secretary "to prescribe the rules and regulations of sanitation under which such establishments shall be maintained."  *Id.*  In enacting the FMIA, Congress found that "[m]eat and meat food products are an important source of the Nation's total supply of food" and that "[i]t is essential in the public interest that the health and welfare of consumers be protected by assuring that meat and meat food products distributed to them are wholesome, not adulterated, and properly marked, labeled, and packaged."  21 U.S.C. § 602.  "The FMIA regulates a broad range of activities at slaughterhouses to ensure both the safety of meat and the humane handling of animals."  *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 455, 132 S.Ct. 965, 181 L.Ed.2d 250 (2012).

In order to achieve the FMIA's "dual goals of safe meat and humane slaughter," the USDA's Food Safety and Inspection Service ("FSIS") "has responsibility for administering the FMIA" and issues "extensive regulations to govern the inspection of animals and meat, as well as other aspects of slaughterhouses' operations and facilities."  *Id.* at 456 (citing 9 C.F.R. § 300.1

*et seq.* (2011)).  In their Motion to Dismiss, Defendants argue that the FMIA and its regulations preempt Tenn. Code Ann. § 14–2–102(a) because the Tennessee law falls "within the scope" of the federal law.  Defendants cite for support regulations adopted by the FSIS and found at 9 C.F.R. §§ 416.2(b) and 416.5(b) & (c).

Section 416.2(b) governs the construction of meat processing facilities and reads as follows:

> (1) Establishment buildings, including their structures, rooms, and compartments must be of sound construction, be kept in good repair, and be of sufficient size to allow for processing, handling, and storage of product *in a manner that does not result in product adulteration or the creation of insanitary conditions.*

> (2) Walls, floors, and ceilings within establishments must be built of durable materials impervious to moisture and be cleaned and sanitized *as necessary to prevent adulteration of product or the creation of insanitary conditions.*

> (3) Walls, floors, ceilings, doors, windows, and other outside openings must be constructed and maintained to prevent the entrance of vermin, such as flies, rats, and mice.

> (4) Rooms or compartments in which edible product is processed, handled, or stored must be separate and distinct from rooms or compartments in which inedible product is processed, handled, or stored, *to the extent necessary to prevent product adulteration and the creation of insanitary conditions.*

9 C.F.R. §§ 416.2(b) (emphasis added).  Section 416.5 governs employee hygiene at meat processing facilities and includes requirements for employee clothing and disease control.  The regulation requires meat processing workers to start the workday with a clean apron or outer garment and change during the workday "as often as necessary to prevent adulteration of product and the creation of insanitary conditions." 9 C.F.R. § 416.5(b).  The regulation further requires the exclusion of "[a]ny person who has or appears to have an infectious disease . . . from any

operations which could result in product adulteration and the creation of insanitary conditions until the condition is corrected."  § 416.5(c).

The Court holds Defendants have not carried their burden at the pleadings stage to show why the FMIA and its regulations preempt Tenn. Code Ann. § 14–2–102(a).  Nothing in the FMIA itself or any of the regulations cited by Defendants preempts the Tennessee statute by implication, under either implied preemption doctrine.  There exists no conflict between federal law under the FMIA and Tennessee law.  Tenn. Code Ann. § 14–2–102(a) protects a person with an objection to taking a COVID-19 vaccine from being required to submit proof of vaccination in Tennessee.  Defendants have not cited any provision in the FMIA or the regulations, requiring meat processors like Defendants to require proof of COVID-19 vaccination, or any other vaccination, for their employees, or compelling workers in meat processing plants to provide proof of vaccination as a term of their employment.  There is then no conflict between the FMIA and its regulations and Tenn. Code Ann. § 14–2–102(a).

And nothing in the FMIA or its regulations implies that "federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.'" *Murphy*, 138 S.Ct. at 148.  On the contrary, the FMIA contains a "savings clause" in 21 U.S.C. § 678.  *Harris*, 565 U.S. at 467 n.10 (describing 21 U.S.C. § 678 as the FMIA's "express preemption clause" and its carve-out for state regulation on "other matters" as a "savings clause").  Section 678's express preemption clause preempts state law on specific matters, while its savings clause permits state regulation "as to 'other matters,' not addressed in the express preemption clause, as long as those matters are consistent with the FMIA." *Id.*; *see also* § 678 ("This chapter shall not preclude any State or Territory or the District of Columbia from making requirement[s] or taking other action, consistent with this chapter, with respect to any other

matters regulated under this chapter."). The Supreme Court has construed the phrase "other matters" to mean that "state laws of general application (workplace safety regulations, building codes, etc.) will usually apply," as long as the state law or regulation is "consistent with" the FMIA. *Id.* at 467 n.10. In the parlance of the field preemption doctrine, § 678 leaves "room for supplementary state regulation" on certain matters regulated under the FMIA. Whatever those matters may be, the FMIA's savings clause is incompatible with the notion that Congress intended to occupy the entire field of regulation covered by the FMIA.

This just leaves Defendants' argument that the FMIA expressly preempts Tenn. Code Ann. § 14–2–102(a). Section 678's express preemption clause blocks states from adopting requirements that are "within the scope" of the FMIA but only those related to meat processing "premises, facilities and operations" where the state requirements are "in addition to, or different than those made under" the FMIA. § 678.[2] The Supreme Court has observed that § 678's express preemption clause "sweeps widely" because it precludes even "non-conflicting" state requirements, if the requirements "fall within the scope of the Act and concern a slaughterhouse's facilities or operations." *Harris*, 565 U.S. at 559–60.

The Supreme Court considered how a state law might fall "within the scope" of the FMIA and its regulations in *National Meat Association v. Harris*, 565 U.S. 452 (2012). California Penal Code § 599f prohibited certain kinds of conduct related to the treatment of disabled pigs in slaughterhouses as animal cruelty and made those acts a felony under state law.

---

[2] Section 678 also expressly preempts state-imposed "[m]arking, labeling, packaging, or ingredient requirements" "in addition to, or different than" the FMIA's. § 678. Because the Tennessee statute at issue is a law of general application and does not implicate in any way the labeling or packaging of meat product, the FMIA's preemption of state-mandated marking or labeling requirements is not relevant in this case.

The issue presented in *Harris* was whether the FMIA preempted California law because the animal cruelty law came "within the scope" of the FMIA and its regulations. In a unanimous opinion, the Supreme Court concluded that the FMIA preempted the California law because it went beyond the FMIA and its regulations and "impose[d] additional or different requirements on swine slaughterhouses." *Id.* at 460 (finding that the California law "compels them to deal with nonambulatory pigs on their premises in ways that the [FMIA] and regulations do not."). After examining the requirements of multiple regulations under the FMIA, the Supreme Court carefully considered how the federal regulations and the California law imposed additional or different requirements for meat processors, for instance, how meat processors handle animals that were disabled upon arrival at a slaughterhouse, 9 C.F.R. § 309.2, or animals that became disabled after coming to a slaughterhouse, § 325.20(c). *Harris* concluded that "California's statute substitutes a new regulatory scheme for the one the FSIS uses," that is, the California law reached into meat processing plant operations and imposed "additional or different" requirements than the FMIA. *Id.* Therefore, the FMIA expressly preempted the California statute because the state law came "within the scope" of the FMIA and its regulations.

With the *Harris* analysis of express preemption under the FMIA in mind, the question becomes whether Tenn. Code Ann. § 14–2–102(a) comes "within the scope" of the FMIA and establishes "additional or different" requirements for meat and poultry processors like Defendants. Tenn. Code Ann. § 14–2–102(a) prohibits a "private business" from "compel[ling] or otherwise tak[ing] an adverse action against a person to compel the person to provide proof of vaccination if the person objects to receiving a COVID-19 vaccine for any reason." Tenn. Code Ann. § 14–2–102(a). On its face and unlike the California law in *Harris*, the Tennessee statute is a law of general application. It prohibits any "private business," and not just meat processors,

from compelling a "person," be it an employee, an invitee, or any other individual, to produce "physical documentation or digital storage of a person's receipt of a COVID-19 vaccine." Tenn. Code Ann. § 14–1–101(16) (defining "proof of vaccination"). Tenn. Code Ann. § 14–2–102(a) does not regulate meat processing "premises, facilities and operations," much less create state requirements "in addition to, or different than those made under" the FMIA. § 678. The very nature of the Tennessee law clearly distinguishes it from the California law analyzed by the Supreme Court in *Harris*.

For their part Defendants have not shown that Tenn. Code Ann. § 14–2–102(a) regulates a matter "within the scope" of the FMIA related to meat processing "operations" and that it imposes "additional or different" requirements on Defendants than those under federal law. *Harris*, 565 U.S. at 559–60. Defendants maintain that Tenn. Code Ann. § 14–2–102(a) implicates meat processing "operations" because the FMIA regulations already require certain steps when a worker at a meat processing plant has an infectious disease. Under 9 C.F.R. § 416.5(c), the FMIA's regulation on employee hygiene and disease control, a meat processing employer must "exclude" "any person who has or appears to have an infectious disease . . . from any *operations* which could result in product adulteration and the creation of insanitary conditions until the condition is corrected." 9 C.F.R. § 416.5(c) (emphasis added). The regulation clearly treats an employee's infectious disease as an "operational" matter. A meat processing employer is required to remove an employee with an infectious disease from "operations," though only "operations" in which the employee's illness could create "insanitary conditions" or render meat "adulterated," terms the regulation does not actually define.[3]

---

[3] The FMIA contains a multi-factor test to determine whether meat or a meat product is "adulterated" for purposes of the statute. Most relevant here, meat is "adulterated" "if it bears or

Defendants argue then that even though the regulations do not address vaccination, vaccination falls "within the scope" of Defendants' "operations" and under § 416.5(c)'s regulation of employees with "infectious disease."

The Court finds that Defendants' argument suffers from a number of problems. First, Defendants can only argue in the abstract that Tenn. Code Ann. § 14–2–102(a) falls "within the scope" of the FMIA and its regulations concerning Defendants' "operations," based on nothing more than the broad notion that COVID-19 vaccination falls within the scope of "infectious disease." Even at such a high level of generality, Defendants' point is not convincing. The regulation does not address all illnesses among all employees working in all operations at meat processing plants. Section 416.5(c) dictates what actions Defendants must take when a worker is ill, and then only a worker with an "infectious disease" and whose job responsibilities might risk adulterating meat or creating insanitary conditions in the plant. Tenn. Code Ann. § 14–2–102(a) has nothing at all to say about that. Tennessee simply prohibits Defendants from taking an "adverse action" against an employee for their refusal to provide proof of vaccination. The Tennessee law does not dictate how a meat processor must treat an employee with an infectious disease. This does not show that Tenn. Code Ann. § 14–2–102(a) falls "within the scope" of the FMIA and its regulations.

Defendants' argument relies on a largely contingent, and at this stage of the case mostly unsupported, assumption that FSIS could have adopted a vaccine mandate as part of its regulation on infectious disease. In order to close the gap between Tenn. Code Ann. § 14–2–

---

contains any poisonous or deleterious substance which may render it injurious to health," and in cases where the substance is not an added substance, the meat is not deemed "adulterated" "if the quantity of such substance in or on such article does not ordinarily render it injurious to health." 21 U.S.C. § 601(m)(1).

102(a)'s protection against being compelled to furnish "proof of vaccination" and 9 C.F.R. §
416.5(c)'s requirement to remove an employee with an infectious disease from certain
"operations," Defendants hypothesize FSIS could have required meat and poultry workers to
take a COVID-19 vaccine.  But Defendants cite no statute, case, or evidentiary support for their
supposition that FSIS had the authority to require vaccination for all workers at meat and poultry
processing plants.  There clearly exists some question about what authority federal agencies had
to issue vaccine mandates during the pandemic.  *E.g. Biden v. Missouri*, 142 S.Ct. 647, 652
(2022) (holding that Secretary of Health and Human Services had authority to mandate
vaccinations for healthcare workers in health setting receiving Medicare and Medicaid funding);
*Nat'l Fed'n of Indep. Bus.*, 142 S.Ct. at 665 (holding that challengers were likely to prevail on
the merits of their challenge to OSHA's nationwide vaccine mandate); *Commonwealth v. Biden*,
57 F.4th 545, 555 (6th Cir. 2023) (holding that challengers were likely to succeed on the merits
of their challenge to the President's vaccine mandate for federal contractors); *Doster v. Kendall*,
54 F.4th 398, 421 (6th Cir. 2022) (holding that members of the U.S. Air Force were likely to
succeed on the merits of their challenge to the Air Force's vaccine mandate); *Livingston Educ.
Serv. Agency v. Becerra*, 35 F.4th 489, 491 (6th Cir. 2022) (holding that challengers were not
likely to succeed on the merits of their challenge to an HHS vaccine mandate for the "Head Start
program staff, contractors, and volunteers").  The OSHA guidance cited by Defendants also
"suggested" the viability of requiring workers to wear masks and undergo regular testing in lieu
of vaccination.  Defendants have not shown why the meat and poultry industry was different or
why FSIS would have rejected these alternative measures.  This is insufficient to demonstrate a
"clear and manifest purpose" on the part of the federal government to override a traditional
police power of the States.  *Wyeth*, 555 U.S. at 565.

The more fundamental problem with Defendants' argument is that Defendants have not shown exactly how Tennessee law "imposes additional or different requirements" on "operations" within a meat processing facility.  Constitutional avoidance requires the Court to "formulate a rule of constitutional law [no] broader than is required *by the precise facts* to which it is to be applied." *Torres*, 938 F.3d at 754–55 (emphasis added) (quoting *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring)). But Defendants have not adduced any evidence to support their claim that the FMIA expressly preempts Tenn. Code Ann. § 14–2–102(a), and certainly not "the precise facts" to which their express preemption theory is to be applied.  Defendants have raised the preemption issue as an affirmative defense in a Rule 12(b)(6) motion.

Absent from Defendants' challenge, coming as it does at the pleadings stage, is any proof concerning the "scope" of the FMIA and its regulations or how Tennessee law falls "within the scope."  One implication of Defendants' argument is that a worker who refused a COVID-19 vaccine was more likely to contract the virus and therefore become unable to work in certain "operations."  However, that supposition does not show why a broad vaccine mandate, covering all workers at the Newbern plant, falls within the scope of § 416.5(c).  Defendants have not shown which "operations" at their Newbern plant fall within the scope of § 416.5(c).  There is no evidence to show how FSIS inspectors construe and apply § 416.5(c) or what steps Defendants take to comply with § 416.5(c), either in the normal course or in the context of COVID-19.

Furthermore, Defendants have not introduced any evidence to show how COVID-19 infections affected operations at the Newbern plant or Defendants' ability to meet the requirements of § 416.5(c) during the pandemic.  Even more specific to this case, Defendants offered no evidence to prove what Plaintiff's job entailed, how coming down with an "infectious

disease" would have affected her ability to do her job, or why alternatives to mandatory vaccination would not have allowed Defendants to comply with the regulation and permitted Plaintiff to carry out her work.[4]  This and other proof may have connected the dots between the "scope" of 9 C.F.R. § 416.5(c), its impact on Defendants' "operations" in a plant like the one in Newbern, and how Tenn. Code Ann. § 14–2–102(a) introduced "additional or different" requirements than those in the regulation.   If Defendants had wanted to make a more particularized showing that Tenn. Code Ann. § 14–2–102(a) falls "within the scope" of 9 C.F.R. § 416.5(c), Defendants could have marshaled evidence to fill in critical gaps in their preemption theory.

The absence of "precise facts" related to the scope of the FMIA and 9 C.F.R. § 416.5(c) and the application of Tenn. Code Ann. § 14–2–102(a) matters in this case.  *Torres*, 938 F.3d at 754–55.  The Court concludes that Defendants have not demonstrated at the pleadings stage why Tenn. Code Ann. § 14–2–102(a)'s protections for persons who hold an objection to COVID-19 vaccination fall "within the scope" of the FMIA or how the Tennessee law "endeavors to regulate the same thing, at the same time, in the same place—except by imposing different requirements" than 9 C.F.R. § 416.5(c) or any other regulation promulgated under FMIA. *Harris*, 565 U.S. at 468.  Therefore, Defendants' Motion to Dismiss in Part is **DENIED** as to this issue.

---

[4] The pleadings shed some light on Plaintiff's job at the Newbern plant.  Plaintiff alleges that her job title was "Packer/Scrapper" and that as part of her job she worked on a production line.  Am. Compl. ¶ 6.  The Amended Complaint explains that Plaintiff "pack[ed] patties within certain specifications, plac[ed] packed patties on the conveyor line, inspect[ed] meat patties on the line to ensure department standards [we]re met, and remov[ed] scraps from the conveyor line."  *Id.*  The Court accepts the allegations as true for purposes of its Rule 12(b)(6) analysis but notes they are the only facts found in the record at this point to show what Plaintiff actually did as a Tyson employee.

## <u>CONCLUSION</u>

As the parties raising the defense of preemption, Defendants have not carried their burden to overcome the presumption against preemption and shown that any source of federal law preempts Plaintiff's claim under Tenn. Code Ann. § 14–2–102(a).   Therefore, Defendants' Motion to Dismiss in Part is **DENIED** but without prejudice to Defendants' right to raise the defense in a subsequently filed dispositive motion.

**IT IS SO ORDERED**.

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date:  May 25, 2023.